301 P.2d 562

**KENNECOTT COPPER CORPORATION, a corporation, and Bingham and Garfield Railway Company, a corporation, Plaintiffs,**

v.

**The STATE TAX COMMISSION, Defendant.**

No. 8091.

Supreme Court of Utah.

Sept. 21, 1956.

C. C. Parsons, A. D. Moffat, Calvin A. Behle, Salt Lake City, Sullivan & Cromwell, New York City, for plaintiffs.

Dey, Hoppaugh, Mark, Johnson & Gilmour, C. M. Gilmour, Frank A. Johnson, Paul S. Roberts, Salt Lake City, for defendant.

McDONOUGH, Chief Justice.

Certiorari to review a decision of the State Tax Commission assessing franchise taxes against the plaintiff, Kennecott Copper Corporation, for the years 1942 to 1950, inclusive; determining that a deficiency existed, and requiring payment of interest to June 15, 1953, upon that deficiency. The deficiency was held by the Tax Commission to amount to $3,568,041.92 and interest was computed to be $1,283,647.81.

The tax assessed for the year 1942 was protested by Kennecott, and the parties appeared before this court in 1950 on questions similar to those here presented; namely, how should the business of Kennecott, a corporation performing various functions in several states, be allocated for the purpose of the Utah franchise tax and what items of cost of production and profit should be included in the computation of net income for the purpose of arriving at the percentage depletion allowed to mining companies by our statutes? This case, reported at 118 Utah 140, 221 P.2d 857, was remanded to the Commission to determine and enter a deficiency judgment in accordance with the views therein expressed.

Kennecott contends that for the purpose of determining taxable income, no sales of minerals or metals may be considered since these sales take place in its New York City office; on the other hand, Kennecott likewise claims the right to include the financial results of smelting and further processing and sales taking place outside the State for the purposes of the depletion allowance. The Commission's position appears similarly inconsistent in that it regards the accounting procedure used by Kennecott as controlling as to the allocation of income to Utah but not as to the amount from which percentage depletion is to be computed. The Kennecott brief supplies us with the mathematical results of an application of the two theories for the years in question:

## Computation of Tax Liability

A. Depletion

| | Kennecott | Commission |
|---|---|---|
| Total net income from mineral products before depletion | $312,647,869.44 | $312,647,869.44 |
| Add profit in selling commission (a) | 394,383.92 | |
| | $313,042,253.36 | $312,647,869.44 |
| Deduct income claimed by Commission to be attributable to smelting, refining, transportation and selling | | $ 69,211,360.48 |
| Net Income subject to percentage depletion | $313,042,253.36 | $243,436,508.96 |
| Depletion allowance—33⅓% | $104,347,417.79 | $ 81,145,502.98 |

B. Taxable Net Income

| | Kennecott | Commission |
|---|---|---|
| Total net income from mineral products before depletion | $312,647,869.44 | $312,647,869.44 |
| Add profit in selling commission | $ 394,383.92 | |
| Add income not subject to depletion | $ 1,067,720.20 | $ 1,067,720.20 |
| Total | $314,109,973.56 | $313,715,589.64 |
| Deduct depletion allowance | $104,347,417.79 | $ 81,145,502.98 |
| Total Net Income after depletion | $209,762,555.77 | $232,570,086.66 |
| Deduct income specifically allocated to Utah (deficit) | $ −950,877.67 | $ −950,877.67 |
| Net Income subject to apportionment | $210,713,433.44 | $233,520,964.33 |
| Apportionment fraction (average) | .64433 | .93484 |
| Apportionable income allocated to Utah | $135,769,340.28 | $218,304,372.05 |
| Add income specifically allocated to Utah (deficit) | $ −950,877.67 | $ −950,877.67 |
| Total taxable income | $134,818,462.61 | $217,353,494.38 |
| Franchise tax at 3% | $ 4,044,553.88 | $ 6,520,604.83 |
| Less tax paid with returns | $ 2,952,562.91 | $ 2,952,562.91 |
| Deficiency | $ 1,091,990.97 | $ 3,568,041.92 |
| Less: Tax paid as condition to review Case 7298 $189,683.82 | | |
| Tax paid under stipulation Dec. 15, 1953 $895,089.65 | $ 1,084,773.47 | $ 1,084,773.47 |
| Present deficiency | $ 7,217.50 | $ 2,483,268.45 |

Because the questions of taxation arise out of the nature of the Kennecott structure and method of doing business, we here adopt, almost in its entirety, the plaintiff's clear and detailed exposition of its operation.

Kennecott is a New York corporation which, since its incorporation in 1915, had had its principal offices and place of business in New York City. These are the executive, administrative, and financial offices of the corporation, where the corporation's president and other principal officers have their offices, where the Board of Directors regularly holds its meetings, and where there is located a large force of executive, administrative, accounting and clerical personnel. In the same office building, paying a proportionate share of the rent and office expenses, is a wholly owned subsidiary of Kennecott, Kennecott Sales Corporation, whose business is to market the products from the various Kennecott properties.

Kennecott has followed a divisional method of accounting for its various operations. One of these divisions is the Utah Copper Division, covering the mining, processing, and ultimate sale of the products originating from property in Utah. The Commission and this Court have held, and Kennecott does not dispute, that the tax returns of Kennecott for the Utah corporation franchise tax should include only such part of the activities and income of Kennecott as is represented by its Utah Copper Division, excluding from such tax returns the income clearly attributable to other divisions of Kennecott.

In Utah Kennecott is the owner of and operates the Utah Copper Mine and a precipitating plant in Bingham Canyon and two ore concentrators at Magna and Arthur. Kennecott is also the owner of certain transportation facilities between its mine and concentrators and between the concentrators and the smelter of the American Smelting and Refining Company at Garfield, Utah.

To recover the metals, most precipitates and all copper concentrates must be smelted, the metals being thus converted into what is known as blister copper. Kennecott delivers its precipitates and concentrates to various smelters at various locations, some within the state of Utah and some without the State. Almost all of the copper concentrate during the years involved was shipped to and smelted at the Garfield, Utah, smelter of American Smelting and Refining Company.

The blister copper resulting from the smelting operation contains the copper and other metals, which, to produce commercially marketable products, must be refined so that the refined metals will be separated one from the other. During the years from 1942 to 1950, the period here under examination, there was no refinery within this State and so refining was performed for

Kennecott by American Smelting and Refining Company at refineries in eastern states.

Kennecott produced no commercial product in Utah other than molybdenite concentrates and a small quantity of copper precipitates, all of which, however, were sold by the Kennecott Sales Corporation in states other than Utah for delivery to buyers located outside Utah. Only the mining of the crude ores, concentration, and smelting, if smelted in Utah, were accomplished within the State; processes of smelting, where smelted outside Utah, and refining and sale were accomplished wholly outside Utah.

The Tax Commission determined that Kennecott's business as the Utah Division was a unitary business, within and without the State, and applied the allocation formula set forth in U.C.A.1943, 80-13-21(6), U.C.A.1953, 59-13-20(6), to obtain the amount of net income from the Utah Division attributable to Utah under the statute. That statute [1] directs the amount of

1. U.C.A.1953, 59-13-20. "Rules for determining net income allocated to this state.

\* \* \* \* \*

"(6) If the bank or other corporation carries on any business outside this state, the said remainder [after direct allocations provided in preceding paragraphs] may be divided into three equal parts:

"(a) Of one third, such portion shall be attributed to business carried on within this state as shall be found by multiplying said third by a fraction whose numerator is the value of the corporation's tangible property situated within this state and whose denominator is the value of all the corporation's tangible property wherever situated.

"(b) Of another third, such portion shall be attributed to business carried on within this state as shall be found by multiplying said third by a fraction whose numerator is the total amount expended by the corporation for wages, salaries, commissions or other compensation to its employees and assignable to this state and whose denominator is the total expenditures of the corporation for wages, salaries, commissions or other compensation to all of its employees.

"(c) Of the remaining third, such portion shall be attributed to business carried on within this state as shall be found by multiplying said third by a fraction whose numerator is the amount of the corporation's gross receipts from business assignable to this state, and whose denominator is the amount of the corporation's gross receipts from all its business.

"(d) The amount assignable to this state of expenditures of the corporation for wages, salaries, commissions or other compensation to its employees shall be such expenditure for the taxable year as represents the compensation of employees not chiefly situated at, connected with or sent out from, premises for the transaction of business owned or rented by the corporation outside this state.

"(e) The amount of the corporation's gross receipts from business assignable to this state shall be the amount of its gross receipts for the taxable year from

"(1st) Sales, except those negotiated or effected in behalf of the corporation by agents or agencies chiefly situated at, connected with or sent out from premises for the transaction of business owned or rented by the corporation outside this state, and sales otherwise determined by the tax commission to be attributable to the business conducted on such premises,

income allocated to Utah to be computed by making calculations in the following steps:

1. Property Factor:

$$\frac{\text{Value of corporation's tangible property in Utah}}{\text{Value of corporation's tangible property everywhere}} \times 100$$

2. Payroll Factor:

$$\frac{\text{Payroll of the corporation in Utah}}{\text{Payroll of the corporation everywhere}} \times 100$$

3. Receipts Factor:

$$\frac{\text{Gross receipts of corporation attributable to Utah}}{\text{Gross receipts of corporation everywhere}} \times 100$$

4. Sum of above three factors divided by 3 = Allocation Per Cent.

to be used. As to the numerator of the third factor, receipts, Kennecott claims that the figure should be zero, inasmuch as all of the sales were made outside of the State by the Kennecott Sales Corporation or by Kennecott itself, and that such sales fell within the definition for exclusion of U.C.A. 1943, 80–13–21(6) (e) (1st), U.C.A.1953, 59–13–20(6) (e) (1st), which reads:

"The amount of the corporation's gross receipts from business assignable to this state shall be the amount of its gross receipts for the taxable year from:

"(1st) Sales, except those negotiated or effected in behalf of the corporation by agents or agencies chiefly situated

As to the first two factors of this formula, the property and payroll factors, the parties are in agreement as to the figures at, connected with or sent out from premises for the transaction of business owned or rented by the corporation outside this state, and sales otherwise determined by the tax commission to be attributable to the business conducted on such premises".

However, the Commission, holding that the Sales Corporation was not such an agent as intended in the meaning of the above statute, excluded from the gross receipts only the sales made directly by Kennecott to American Smelting and Refining Company; that is, the sales of gold and silver. The relative importance of the different types of sales is indicated by the following summary of the percentages

"(2nd) Rentals or royalties from property situated, or from the use of patents, within this state.

"(f) The value of the corporation's tangible property for the purpose of this section shall be the average value of such property during the taxable year."

of the total dollar sales during the years 1942 to 1950, inclusive:

(a) Sales by Kennecott Sales Corporation, Copper and Molybdenite .................... 87.79%

(b) Sales directly by Kennecott to A. S. & R., Silver and Gold 12.20%

(c) Sales by A. S. & R. for Kennecott, Platinum and Palladium .01%

---

100.00%

It is thus obvious the reason for the disparity in the apportionment fraction as computed by the two parties. Kennecott regards the sales of copper and molybdenite as made by the corporation outside of the state and arrives at an apportionment fraction of about .64433, varying, of course, with yearly changes; whereas, the Commission holds that those sales were made by an independent corporation acting in its own business and finds an average apportionment fraction of .93484.

The case has been further complicated by the Commission's assertion on review that this Court has the power and should modify the Commission's decision to allow taxation on the entire net income of the Utah Copper Division on the basis of the Kennecott divisional accounting, deducting an allowance for the proportionate costs of maintaining the administrative offices in New York. The power to so determine a corporation's net income without regard to the statutory formula, the Commission claims, is derived from the broad powers granted the Commission in U.C.A. 1943, 80-13-21(8), U.C.A.1953, 59-13-20 (8):

"If in the judgment of the tax commission the application of the foregoing rules does not allocate to this state the proportion of net income fairly and equitably attributable to this state, it may with such information as it may be able to obtain make such allocation as is fairly calculated to assign to this state the portion of net income reasonably attributable to the business done within this state and to avoid subjecting the taxpayer to double taxation."

The Commission contends that the mandate of this court in Case No. 7298, Kennecott Copper Co. v. State Tax Commission, 118 Utah 140, 221 P.2d 857, required the Commission to regard the Utah Copper Division as a separate entity, acting only within this state, and to assess the tax on the entire net income as shown by its separate books of account. The misunderstanding arises because the term "separate accounting" has been used as a term of art in distinguishing situations where separable income, properly reflecting the true amount of net income attributable to the taxing state, was more fairly demonstrated by accounting procedures than by refer-

ence to the statutory formula for apportionment of income, which is necessarily arbitrary; whereas, Case No. 7298 merely determined that the Commission had the power under section 8, U.C.A.1943, 80–13–21, supra, to limit its inquiry for tax purposes to the net income connected directly with the affairs of the Utah Division. Until the year 1942, Kennecott had reported its income taxable in this state with reference only to the Utah Division, thus following the procedure used by the Utah Copper Company prior to its merger with Kennecott as the Utah Division, when Kennecott requested that the tax computation be based upon an apportionment derived from including all of the divisions of Kennecott and then applying the formula prescribed by the statute; the Commission refused to allow the change and this court upheld that decision.

The result of that holding is that it creates a situation somewhat unique in the cases. Kennecott, a New York Corporation, is the taxpayer; but the activities of its Utah Division are completely separate from its other mining divisions with the exception of unifying sales and administrative offices. The Commission raises the question as to whether the Utah Division, the taxable unit, ever acts outside of the State so as to be allowed to apportion some of its income outside the State. In other words, does the separation of accounts preclude the application of the formula when such accounts deduct a proportionate share of the administrative expenses? In its decision below, the Commission evidently placed emphasis upon the view that Kennecott Corporation is the taxpayer in recognizing the unitary, interstate business done; but here its argument stresses the fact that the Utah Division should be regarded as an entity for tax purposes.

 It is unnecessary for us to consider separately, regardless of the question of propriety of the Tax Commission's seeking a reversal of its own decision, whether or not the tax might be based upon Kennecott's separate books of account in view of the conclusion we have reached upon the method the Commission actually used in applying the formula. The Commerce Clause of the U. S. Constitution, Art. 1, § 8, cl. 3 has been interpreted to limit the power of the states to tax a business upon receipts earned in interstate commerce and the U. S. Supreme Court has approved the use of allocation formulae in determining what part of gross or net receipts are properly attributable to business done within the taxing state. International Harvester Co. v. Evatt, 329 U.S. 416, 67 S.Ct. 444, 91 L.Ed. 390; Western Live Stock v. Bureau of Revenue, 303 U.S. 250, 58 S.Ct. 546, 82 L.Ed. 823; Gwin, White & Prince v. Henneford, 305 U.S. 434, 59 S.Ct. 325, 83 L.Ed. 272; Underwood Typewriter Co. v. Chamberlain, 254 U.S. 113, 41 S.Ct. 45, 65 L.Ed.

316

165; Butler Bros. v. McColgan, 315 U.S. 501, 62 S.Ct. 701, 86 L.Ed. 991; Norfolk & Western Ry. Co. v. State of North Carolina, 297 U.S. 682, 56 S.Ct. 625, 80 L.Ed. 977. Also entering upon the constitutionality of state taxation of property and activities beyond its borders, and cutting across the legal questions raised by both Kennecott (the constitutionality of the method of application of the formula by the Commission) and by the Tax Commission (the right of the state to tax all of the income of the Utah Division) is the Due Process clause of the 14th Amendment. St. Louis Cotton Compress Co. v. State of Arkansas, 260 U.S. 346, 43 S.Ct. 125, 67 L.Ed. 297; Connecticut General Life Ins. Co. v. Johnson, 303 U.S. 77, 58 S.Ct. 436, 82 L.Ed. 673; Union Refrigerator Transit Co. v. Commonwealth of Kentucky, 199 U.S. 194, 26 S.Ct. 36, 50 L.Ed. 150. It is essential to the validity of a tax that the property taxed shall be within the territorial jurisdiction of the taxing power.

■ It is true that the tax here sought to be exacted is a tax upon the privilege of doing business within this State and not a property tax; but the value of that privilege is measured by a percentage comparison of three property factors, here and elsewhere, and the numerators of the fractions used in the computation must be properly within the jurisdiction of the taxing state. The point is clearly illustrated with reference to tangible property; the Kennecott property in New York could not be included in the numerator of the first fraction since its permanent situs is established outside of this State.

■ The situs of intangible property, however, appears to present a more difficult problem. Sales, as an intangible, may have the situs set by statute, and state statutes have attributed sales to the place of manufacture, mining or origination of the goods,[2] the place of destination of shipment to the purchaser,[3] location of stock of goods from which the order was appropriated,[4] or the location of the sales office handling the transaction,[5] such as the Utah statute under consideration. Presumably, the Legislature might localize the business situs of intangible property in another manner than it has chosen, but it must be in relation to some attribute of the intangible occurring in the taxing state. See Maytag Co. v. Commissioner of Taxation, 218 Minn. 460, 17 N.W.2d 37.

■ By U.C.A.1943, 80–13–21(6) (e) (1st), supra, the Utah Legislature localized the situs of sales as factors in the computation of franchise tax to the location of the sales office primarily responsible for the sale, and excluded from the computation

2. New Mexico, Virginia.
3. Colorado, Georgia, Iowa, Oklahoma, Tennessee.

4. Alabama, New York, Oregon.
5. Pennsylvania, Massachusetts, Arizona.

sales negotiated or effected in behalf of the taxpayer by agents or agencies chiefly situated at, connected with, or sent out from premises for the transaction of business owned or rented by the taxpayer or by his agents or agencies outside the State.

The Utah Division of Kennecott Copper has no power to negotiate a sale nor have its officers attempted to sell any of the products from the mine. It is concerned only with production and shipment. No sales are made from any offices in Utah, nor are supervisory controls of sales maintained here. Transfer of title from Kennecott to Kennecott Sales Corporation is not negotiated or effected within this State; both the administrative offices and the sales offices are located in New York and the corporation's legal domicile is New York. Regardless of the Commission's characterization of the Sales Corporation as a commission merchant, selling in its own behalf, both the transfer from the taxpayer to its subsidiary and the transfer from the subsidiary to the ultimate consumer take place entirely beyond the jurisdiction of Utah's taxing powers. It is obvious that Utah offices do not contribute to "negotiating and effecting" the sales, which is the touchstone under the statute for the allocation of sales.

Cases relied upon by the Commission are all in accord with the principle announced above. Commonwealth v. Minds Coal Mining Corporation, 360 Pa. 7, 60 A.2d 14;

held that where a West Virginia Corporation mined coal in West Virginia, which was sold in New York by an independent company, its sales were allocable to Pennsylvania, where the administrative offices were located. The defendant argued that the sales were assignable to West Virginia because title passed when the cars were loaded; but the court held that although the superintendent at the mine performed the final act of executing the sales, he neither negotiated nor effected the sales. Commonwealth v. Continental Rubber Works, 347 Pa. 514, 32 A.2d 878, and Commonwealth v. Bayuk Cigars, Inc., 345 Pa. 348, 28 A.2d 134, affirmed 318 U.S. 746, 63 S.Ct. 991, 87 L.Ed. 1123, merely demonstrate the application of a statute similar to ours where more than one state might claim that negotiation and effectuation of sales occurred because of activities within its borders. Here there is no such connection between activities in this State and the sales.

On this part of the case we reverse those portions of the Commission's findings and conclusions which attribute sales to Utah where no taxable event occurs within this State under the definition of business situs of sales adopted by the Legislature.

In the former proceeding involving Kennecott's taxes for the year 1942, the Tax Commission presented a rather complicated formula to determine the amount of deple-

tion allowable under our statutes,[6] granting a depletion allowance of "thirty-three and one-third per cent of the net income from the property during the taxable year." Basing its computation upon the premise that the property upon which a depletion allowance was available to the taxpayer was merely the mining property, the wasting asset itself, although the net income from that property was not determinable, since processing and sale contributed an indefinable amount to the profits, the Commission devised a formula relating mining costs to post mining costs and attributing income to the two operations in the same ratio. This court, in that case, Kennecott v. State Tax Commission, supra [118 Utah 140, 221 P.2d 866], declined to endorse that formula, but stated:

"* * * The taxpayer in its petition for redetermination alleges that its operations are indivisible but it, nevertheless, makes a percentage allocation between the activities carried on in this state and the post-mining activities performed elsewhere. Therefore, if any net income is attributable to business done elsewhere, it must come

from operations which would not be considered ordinary treatment processes normally applied by operators. The taxpayer in this instance is in a rather inconsistent position to assert that net income pertaining to business performed outside this state can be considered as net income from the property. By splitting its income between this state and other places, the taxpayer has established that it can assign portions of its income to mining operations and to post-mining activities.

"We need not place our approval on the formula used by the Commission or arbitrarily determine the breakthrough point between mining operations and post-mining activities. All we need do in this case is to point out that there are two possible paths for the taxpayer to take. The Commission might agree that it take either but it cannot traverse both. Either the net income is from the property and should be allocated to this state, or the net income is from both the property

6. U.C.A.1943, 80–13–8, U.C.A.1953, 59–13–7 "In computing net income there shall be allowed as deductions:

&ast; &ast; &ast; &ast; &ast;

"(8) In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all

cases to be made under rules and regulations to be prescribed by the tax commission. * * *

"(9) * * * (b) The allowance for depletion shall be thirty-three and one-third per cent of the net income from the property during the taxable year, computed without allowance for depletion. * * *"

and the post-mining activities and they are not so related that the net income cannot be roughly allocated to both sources. * * * "

Kennecott claims that by subjecting a depletion allowance of one-third of its total net income from the Utah Division to the allocation formula, it achieves a resulting figure that approximates one-third of the net income from business attributable to Utah. However, it requires no particular mathematical acumen to observe that this method of computation allows a depletion deduction upon post-mining activities in other states which Kennecott asserts are responsible for producing about one-third of its net income, regardless of whether the depletion deduction calculation or the allocation to Utah is made first.

 Depletion is a statutory grace allowed in the determination of net income prior to the allocation of business without and within Utah, just as are costs and expenses, taxes, and losses. These items are deducted from the gross income regardless of where the property or personnel earning the income are located, and the difference between gross income and these deductible items is the net income from which is determined the income allocable to the State of Utah.

 If depletion were based upon an appraisal at the mine of the devaluation of the property due to the past year's activities, that amount would simply be deducted from the total net income. Because of the extensiveness of both the mine and the activities of the corporation, it is necessary to determine the value of the mine in producing income by reference to an allocation formula. Therefore, the devaluation of the mine, when related by statute to that income, must be based upon the same formula for consistency's sake.

 Under the formula, Kennecott allocates to Utah approximately two-thirds of its net income as the value of its franchise in this State. Since its entire activities within this State are concerned with mining, this figure must represent the net income from the mining property. One-third of this amount is allowed as a depletion deduction to be claimed from gross income in computing net income which is the basis for the allocation formula.

The Commission specifically rejected the view that depletion should in any way be computed with respect to the apportionment fraction, except for purposes of comparison. The reasons for so doing are clearly set forth in the Commission's findings. It states that the variable factors concerned with the assignment of income to Utah have no relation to depletion which should be 33⅓% of an amount representing the gross value of the mineral at the mine, less mining costs and applicable Federal

taxes. Concededly, this view is possibly valid where applied to corporations marketing their products in different ways, but this is a question which we need not here determine. The problem here is to determine what the value of the mine is in relation to the earning of net income, and the ceiling upon a ⅓ depletion allowance is set by the amount of income attributable to this state where the only property concerned in the computation is the mining property located here and granted the allowance by statute.

U.C.A.1953, 59–13–28 provides:

"Interest upon the amount determined as a deficiency shall be assessed at the same time as the deficiency, shall be paid upon notice and demand from the tax commission, and shall be collected as a part of the tax, at the rate of six per cent per annum from the date prescribed for the payment of the tax to the date the deficiency is assessed."

The Tax Commission computed the interest below from each of the due dates and assessed it to June 15, 1953, in the amount of $1,283,647.81. Inasmuch as the Commission has the power to waive or reduce the penalty or interest assessed against the taxpayer, U.C.A.1953, 59–13–57, Kennecott assails its failure to do so as an abuse of discretion. Kennecott cites to us the varying positions taken by the Commission with respect to the assessment of the deficiency since 1942, as evidence that it was unable to determine the amount due so as to pay the tax. However, since the part of the tax upon which the Commission's views changed several times was the amount of allocation of the net income to the State of Utah and this matter is determined in favor of Kennecott by this opinion, no interest is due which relates to that question.

As to the amount which will be determined as a deficiency as a result of an excessive amount deducted as depletion allowance under Kennecott's self-assessment, we see no reason for interfering with the Commission's discretion in the matter of interest. 85 C.J.S., Taxation, § 1054.

Reversed and remanded for recomputation and assessment.

HENRIOD and WORTHEN, JJ., concur.

CROCKETT, Justice (special and supplemental concurrence).

Although the Tax Commission purported to follow the formula method (Massachusetts Formula) authorized under 80–13–21 (6) U.C.A.1943,[1] review of this case clearly indicates that it regards the result obtained

1. Now Sec. 59–13–20(6), U.C.A.1953.

from a literal application of that formula as producing an unrealistic and inequitable result insofar as the taxpayer is concerned. Illustrative of this are the figures for 1942 as set forth in the Commission's brief as a typical year. (All sums are given in round figures.) In that year the Utah Mine produced 86 million dollars gross income which Kennecott reduced to 5.8 million dollars for Utah tax purposes. Some of the deductions are, of course, not subject to question: operating expenses—44 millions, federal taxes—20 millions. Subtracting the depletion allowance of 13 million dollars (contested by the Commission and now modified to some extent by the majority opinion) leaves a net of 9 million dollars. It is the manner of application of the statutory formula to this sum, resulting in the figure of 5.8 millions for Utah tax purposes that gives rise to disagreement.

A general survey of the source of income and the manner in which it is earned pointedly supports the view of the Commission that the above allocation is inequitable to this State. It is here that the valuable asset exists which is being depleted by the production of the gross income; and here 5,000 employees are engaged in producing the ores and administering Kennecott's western mining division. To this approximately 64% of the net income from the Utah Mine is allocated. Contrasted to this, 36% of the net income from the Utah Mine is claimed allocable to the activities of Kennecott's general administrative offices and only 28 employees which constitute the Kennecott Sales Corporation in New York.

The disparity just referred to is further emphasized by the fact that the sale of gold and silver (roughly 12% of total sales) is made automatically to the Federal Government, while the sale of copper under Federal control (which existed throughout a large part of the period in question) involves little more than order taking. Still, under the formula, 36% of the income from the Utah Mine must be attributed to these sales and administrative efforts.

Of this 36%, a large portion (33⅓% of the total) is allocated outside of this State in the sales factor of the formula due to the mere fact that the sale is effected in a foreign state. If the sales were made in Utah, virtually all of the income would be allocated here. Under the instant facts altogether too great importance is thus placed on the location of the place of sale. However reasonable the formula may be where selling efforts might justify approximately one-third of the total effort required to produce the income, it is unrealistic and inequitable in the instant case because it fails to take cognizance of the true source and manner of production of this income and the method in which sales are made.

It also seems plain that the statute authorizing allocation by the formula, subsection (6), as now written, lends itself to a type of operation by the taxpayer whereby no tax is paid to Utah or any other state on part of its net income. By contending for the use of the formula the taxpayer succeeds in having 33⅓% of its income (practically all of the gross receipts from sales) allocated outside of this State in the sales factor of the formula as above mentioned. The sales are made by Kennecott Sales Corporation of New York, a wholly owned subsidiary of Kennecott. But on the books of the parent company, its subsidiary and divisions, only $1 per ton for copper and $3.50 per ton for molybdenite is credited as income (by way of sales commission) to Kennecott Sales Corporation in New York. The remainder is shown on the books as income to the Utah Division with the commissions being charged to the Utah Division as an expense. In New York, therefore, no part of the 33⅓% of the Utah Division's net income allocated outside the State in the sales factor of the formula would be taxed as income to the Kennecott Sales Corporation.

Furthermore, it seems clear beyond dispute that none of this income attributed to sales outside the State is taxed to the parent company, Kennecott, either; and that it evades having this portion of its income reported in any state.

Two salient facts point to the foregoing conclusion:

First, the Utah franchise tax was 3% of the net income *after* Federal taxes, as compared to a franchise tax of 4½% *before* Federal taxes in New York. Consequently, there is no likelihood that the income was reported and taxed in New York in preference to reporting it in Utah.

Second, any doubt whatever that might exist is effectively obviated by the manner in which this issue was evaded at the hearing before the Commission as evidenced by the following colloquy:

Mr. Gilmour (for the commission): "May I also inquire what your position is going to be on the request that we made with respect to whether or not Kennecott files returns in other states with respect to the income which they are here contending should be excluded from Utah?"

Mr. Parsons (for Kennecott): "I think I have made our position clear; I have tried to at any rate. What taxes Kennecott may or may not pay outside the state of Utah, what tax returns it may file to tax collecting agencies outside the state of Utah, is of no concern to the state of Utah or this Commission and we are not going to furnish you that information. Frankly, I don't know what it is and I am

not going to find out; and if you ask the witness that question, it will be my advice to the witness that he refuse to answer on advice of counsel. That question isn't at issue. It isn't in this case as we see it."

At another point Mr. Fernald, a witness for Kennecott, was asked on cross-examination the following question:

Mr. Gilmour: "Does Kennecott Copper Corporation assign or return any portion of the net income of the Utah Mines Division to any other state for state income or franchise tax purposes?"

After an objection to the question as "irrelevant and immaterial and incompetent" was overruled, the record shows that counsel responded as follows:

Mr. Parsons: "It is my instruction to the witness not to answer that question."

Mr. Gilmour: "Do we understand from that instruction, Mr. Parsons, that you are instructing your witness to refuse to answer a question which the Tax Commission thinks is relevant to the issues of the case?"

Mr. Parsons: "I think the record is perfectly clear."

It is undoubtedly true that, had the Commission been so inclined, it could have made a finding on that issue adverse to the taxpayer because of this arbitrary refusal to cooperate in furnishing pertinent information. It is well settled that where a party suppresses or refuses to give evidence which is available to it, that an inference may be drawn that the fact, if disclosed, would be adverse to the interests of such party.[2]

Conceding that ordinarily it is no concern of the taxing state whether taxes payable by the taxpayer in another state are collected, it is nevertheless the writer's opinion that the information here sought was relevant and material as bearing on how Kennecott regarded its operation in New York in relation to the operation carried on in Utah in order to determine the amount of income properly allocable here. Further, I see no escape from the conclusion that it was material for the Commission to find out this fact because, when a computation according to the statutory formula "does not allocate to this state the proportion of net income fairly and equitably attributable to this state" it has the duty and prerogative under Section 80–13–21(8) to devise a formula which will produce such result.

2. Holmes v. Hatch, 11 Cal.2d 376, 80 P. 2d 70; Cf. Starkweather v. Conner, 44 Ariz. 369, 38 P.2d 311; Coeur D'Alenes Lead Co. v. Kingsbury, 59 Idaho 627, 85 P.2d 691; Stricker v. Billingsley, 169 Okl. 145, 36 P.2d 474; Saddler v. Watkins, 169 Okl. 279, 36 P.2d 760.

324

It is further my opinion that the Utah State Tax Commission, the constitutional body empowered to administer the tax laws of our State,[3] to conduct hearings and determine such matters as were then under consideration, should not be subjected to the indignity of having counsel for the taxpayer presume to overrule its ruling that a witness should answer questions on matters the Commission deemed material.

I am neither unaware nor unappreciative of the fact that Kennecott Copper Corporation is a very large mining operator and taxpayer and that its operations within this State and the taxes it pays are both of great importance to our economy. Nevertheless, it is entitled to only the same consideration as every other taxpayer: equal and exact justice under the law. Neither its size nor its importance in our economy should cause any bias or prejudice for or against it or in any way becloud the true issue. It is of the utmost importance here, as it is with every taxpayer, when the issue is joined, that the Tax Commission be furnished all pertinent information in order that it may correctly determine the income attributable to business done within this State.

It is entirely proper for the Tax Commission to bear in mind that we have great mineral resources which are being depleted, and this, to a large extent, by absentee owners; and that in fairness to this state and its citizens, it is essential that the net income of such operations should be fairly and equitably allocated here for computation of the franchise tax imposed for the privilege of thus doing business. It was in recognition of this need, and the realization of the impossibility of arriving at such a result in every case under the formula authorized under subsection (6) that the Legislature enacted subsection (8) which expressly permits other means of computing the income to be allocated to this state when the formula does not, in the opinion of the Commission, produce a fair and equitable result.

From the fact that it is so indisputably clear that Kennecott does not report and pay taxes on the portion of income in question in New York, it follows that so far as its New York books are concerned, it must consider this income as attributable to Utah; yet in Utah it refuses to report such income as allocated here and seeks to exclude it by taking refuge in the statutory formula. If this is not tax evasion, then I would like to have someone explain why not and point out the error of my conclusion on that point. In view of this, it seems to me that the Commission was entirely justified in believing that the resulting tax is not fair and equitable. That being so, it is to be conceded that the Commission should not have attempted to fol-

3. Const. Art. XIII, Sec. 11, implemented by Title 59, U.C.A.1953.

low the formula under subsection (6), but should have proceeded under express power granted it by subsection (8) to devise a formula which would make a fair allocation of the taxpayer's income to Utah.

I agree that inasmuch as the Commission elected to proceed under subsection (6), we are bound by that statute as phrased by the Legislature, and for reasons stated in the majority opinion, are powerless to affirm a decision of the Commission which assigns to this state in the sales factor of the formula, gross receipts for sales made outside of the state. Nor is it properly within the prerogative of this court to devise another formula for the allocation of income in some other way. That power is reposed in the Tax Commission. Our function is limited to an inquiry into, and a determination of the lawfulness of the decision of the Commission.[4] The performance of our duty requires us to remand the case to the Tax Commission for further proceedings and the computation of a tax on a correct basis when that appears to be necessary.

For the reasons stated in this opinion I earnestly urge upon my colleagues the necessity, the propriety, and the justice of remanding this matter to the Commission so that in the light of the opinion of this court that it incorrectly proceeded under subsection (6), it may take such further proceedings as it deems proper under the prerogative given it under subsection (8) which provides:

"If in the judgment of the tax commission the application of the foregoing rules does not allocate to this state the proportion of net income fairly and equitably attributable to this state, it may * * * make such allocation as is fairly calculated to assign to this state the portion of net income reasonably attributable to the business done within this state * * *."

to the end that a tax may be assessed against this taxpayer which in the judgment of the Tax Commission is equitable and just. This would of course have to be done with due regard to the fact that any formula so devised must be equitable to this taxpayer and also to others similarly situated. That this may present difficulties does not obviate the fact that it is necessary and proper that such result be accomplished.

WADE, Justice (concurring)

I concur with the opinion of Chief Justice McDONOUGH and I also agree with the views expressed by Justice CROCKETT. Although we may remand this matter to the Tax Commission for further proceedings in conformity with the law and the opinion of this Court, it is not within our prerogative to make suggestions as to

4. Sec. 80–13–47, U.C.A.1943.

326

the formula to be followed by the Commission nor to direct them to follow any such suggestions. On such matters the views of the members of this Court are immaterial, the prerogative being vested in the Commission. As I view it Justice CROCKETT'S opinion does not disagree with the opinion of Chief Justice McDONOUGH, but only supplements it by pointing out that the Commission may now proceed under subsection (8) if it seems so advised.